UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
HB and SB, individually and as parents of LB, a minor
under the age of 18 years,

                              Plaintiffs,

              - against -                                    **OPINION AND ORDER**

MONROE WOODBURY CENTRAL SCHOOL                               No. 11-CV-5881 (CS)
DISTRICT, MONROE WOODBURY CENTRAL
SCHOOL DISTRICT BOARD OF EDUCATION, and
unknown agents and assigns of MONROE WOODBURY
CENTRAL SCHOOL DISTRICT, 1-100,

                              Defendants.
-----------------------------------------------------------------------x

Appearances:
Jamie Mattice
Giulia Frasca
Peter Hoffman
Law Office of Peter D. Hoffman, P.C.
Katonah, New York
*Counsel for Plaintiffs*

Adam Kleinberg
Leo Dorfman
Sokoloff Stern LLP
Westbury, New York
*Counsel for Defendants*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/27/12

Seibel, J.

        Before the Court is the Motion to Dismiss of Defendants Monroe Woodbury Central

School District (the "District"), Monroe Woodbury Central School District Board of Education

(the "BOE"), and unknown agents and assigns of the District (collectively, "Defendants"),

pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Doc. 10.)  For the following reasons, Defendants' Motion is GRANTED.

## I.     **Background**

For the purposes of the present Motion, the Court accepts as true the facts (but not the conclusions) as stated in Plaintiffs' Amended Complaint ("AC").

### A.     Factual Background

LB is a sixteen-year-old female who attended school in the District from September 2000 through November 2010.  (AC ¶¶ 7, 11.)[1]  Plaintiff SB is LB's mother and HB is LB's father. (*Id.* ¶ 7.)  They are all of Puerto Rican descent and are residents of Highland Mills, New York. (*Id.*)

#### 1.     Molestation by PG

Beginning when LB was twelve years old and in middle school, her neighbor, PG, who attended Monroe Woodbury High School (the "School"), started molesting her.  (*Id.* ¶ 12.)  LB did not tell anyone about the abuse until, in February 2010, she confided in a friend, who then told a school guidance counselor.  (*Id.*)  At this time LB also informed her parents about the abuse.  (*Id.*)

#### 2.     Spring and Summer 2010 – Facebook Threats by the Girls

In May 2010, while LB was a student at Monroe Woodbury Middle School, Plaintiffs became aware of threats made by seven freshman girls (CM, AF, KS, VS, BK, BA, and KH) (collectively, the "Girls"), toward LB on Facebook.  (*Id.* ¶ 13.)  The Girls threatened that when LB started high school in the fall of 2010, "she would be 'taken care of.'"  (*Id.*)  Plaintiffs notified Mrs. Koletta, the Middle School social worker, and Mr. Cotto, Assistant Principal at the

---

[1] "AC" refers to Plaintiffs' Amended Complaint.  (Doc. 9.)

Middle School; Cotto assured Plaintiffs that the matter would be addressed. (*Id.* ¶ 14.) The threats of violence continued throughout the summer of 2010, (*id.* ¶ 15), and in August 2010, HB notified the School's guidance office about the threats, (*id.* ¶ 16).

### 3.   Fall 2010 – LB Starts High School

On September 2, 2010, the first day of school, LB reported the Girls' "harassment" over the summer to the School's guidance office. (*Id.* ¶ 17.) Upon leaving the guidance office, five of the Girls "taunted" LB and at some point that day, AF spit on LB. (*Id.*) LB reported the taunting to Dalila Serrano, the "C" House Dean of Students, who told LB she would handle the matter. (*Id.*) After school that day, HB called Mr. Carney, a teacher at the School, and informed him that HB and SB were "shocked to learn that LB was bullied that day." (*Id.* ¶ 18.) HB also notified Carney, Assistant Principal Heath Yarmus, and Guidance Chairperson Wayne Williams that LB had previously been molested by PG, yet PG and LB had been placed in the same lunch period. (*Id.*) HB and SB followed up with several calls to the School requesting that PG be removed from LB's lunch period. (*Id.* ¶ 19.) After two weeks, PG remained in LB's lunch period, so HB and SB obtained a copy of an Order of Protection against PG, brought it to Carney, and demanded that PG be removed from LB's lunch period. (*Id.* ¶ 20.) PG was removed the next day. (*Id.*)

### 4.   September-October 2010 – The Girls' Mistreatment of LB

On September 3, 2010, AF and CM shoved LB as LB was walking to meet with a school counselor. (*Id.* ¶ 21.) Plaintiffs asked Assistant Principal Tim Martin to keep the videotape of the incident and "sought assurances that AF would be disciplined." (*Id.*) On September 7, 2010, Carney called Plaintiffs to inform them that "the same 5 [G]irls were caught screaming in the hallway that LB was a 'fucking' rat for telling Mr. Carney about the September 3, 2010 incident"

3

but that "LB would be protected." (*Id.* ¶ 22.) On the afternoon of September 14, 2010, SB went

to the School to give LB her soccer uniform. (*Id.* ¶ 23.) When she arrived, she saw four girls

surrounding LB outside of the School "putting their hands directly in LB's face and threatening

her with violence." (*Id.*) Plaintiffs reported this incident to Yarmus, and he responded that he

would speak with the School principal, Mr. Bernsley, about it. (*Id.* ¶ 24.) On September 15,

2010, Plaintiffs told school officials that five of the Girls "were asking LB's friends for her

cellular phone number" and "expressed concern that the [G]irls were spreading rumors that LB

was a 'whore.'" (*Id.* ¶ 25.) At a school football game on September 24, 2010, a male student

was heard yelling "'hey whore'" at LB. (*Id.* ¶ 26.) Plaintiffs informed Bernsley and Police

Officer Decker (also a School Youth Officer) about the incident and told them it was related to

bullying by five of the Girls. (*Id.*) They responded that they would "'look into it,'" and the male

student was later suspended for fighting with a student who came to LB's defense. (*Id.*)

On October 12, 2010, Plaintiffs informed Serrano that "the same 5 [G]irls followed LB

into the girls [*sic*] bathroom," threatened her with violence, and called her "'dirty spic'" and

"'gorilla.'" (*Id.* ¶ 27.) The next day, while waiting for LB in the School parking lot, HB saw

CM, BA, VS, and VS's twenty-four-year-old brother yell at and threaten LB. (*Id.* ¶ 28.) HB

asked why they were harassing LB, and VS's brother "told HB to 'move the fuck out of [his]

way or [he] will run [HB] over with [his] car.'" (*Id.* (alterations in original).) A nearby school

safety officer told VS's brother to wait for the police to arrive, to which VS's brother responded

with the same threat he made to HB. (*Id.*) Assistant Principal John Kaste, Decker, and other

school safety officers responded to the scene, at which point HB: (1) told them that these Girls

had been harassing LB since May 2010 and that nothing had been done to stop the threats and

harassment; and (2) requested the surveillance tapes from the incident. (*Id.* ¶¶ 28-29.) Decker

said that he would notify VS's brother's father (a former police officer) about the incident, and HB was told that they would review the tapes and get back to him. (*Id.* ¶ 29.)

On October 15, 2010, Plaintiffs went to the movies in Monroe, New York and ran into BK who yelled at LB, "'Oh look, here is the fucking cunt,'" and told HB to "'fuck off.'" (*Id.* ¶ 30.) Plaintiffs contacted the police who told them that a complaint would be sent to the School. (*Id.* ¶ 31.) On October 18, 2010, Plaintiffs informed Serrano about the movie theatre incident. (*Id.* ¶ 32.) She responded that there was nothing the School could do because it happened off of school property. (*Id.*) Plaintiffs stated that the altercation was a "direct result" of incidents that had happened at the School, to which Serrano replied that she would look into it. (*Id.*)

On October 28, 2010, LB was approached in a school common area by CM, KH, VS, and KS "in an aggressive manner." (*Id.* ¶ 33.) They called LB a "'bitch'" and said they would "'fuck' her up," and CM punched LB in the side of the head; LB hit her back "in self defense." (*Id.*) HB went to the School and asked Kaste to review the surveillance tape from the incident before taking any disciplinary action. (*Id.* ¶¶ 33-34.) Kaste agreed and set up a meeting for October 29, 2010 to discuss the incident with HB. (*Id.* ¶ 34.) Plaintiffs also told Decker that they wanted to press assault charges against CM. (*Id.* ¶ 35.) Decker responded that he had to wait for the results of LB's medical examination before charges could be filed. (*Id.*) Plaintiffs took LB to Monroe Pediatric, where LB was treated for scratches. (*Id.* ¶ 35.) They then left messages for Decker regarding the results, but he never returned their calls. (*Id.* ¶ 36.)

On October 29, 2010, HB, Kaste, and Serrano met to discuss the fight between LB and CM and the availability of the surveillance videotapes. (*Id.* ¶¶ 37-40.) HB informed Kaste about a Facebook page dated October 28, 2010, where Student KH admitted to starting the fight with LB. (*Id.* ¶ 37.) Kaste, who stated that he saw the fight, replied that the School has a "zero

tolerance" policy for violence and that LB would be suspended for five days. (*Id.* ¶¶ 37, 39-40.) HB also stated that LB has had to defend herself from CM for six months, to which Kaste responded that "'it has ONLY been 2 and a half months of bullying.'" (*Id.* ¶ 38 (emphasis in original).) On November 4, 2010, Plaintiffs requested, through Superintendent Mehrhof, permission to home-school LB until they could place her in a "safer" school, but the request was denied. (*Id.* ¶ 42.)

Plaintiffs allege that the "bullying and harassment" LB endured caused her grades and performance on the soccer team to deteriorate. (*Id.* ¶¶ 43-44.) Finally, "[d]ue to the hostile educational environment and extreme risk of harm to LB and the entire family," Plaintiffs removed LB from the School, and on November 15, 2010, she started at a private school, John Burke Catholic High School. (*Id.* ¶ 45.)

B.    Procedural Background

Plaintiffs filed their Complaint in this action on August 22, 2011. (Doc. 1.)  On November 4, 2011, the parties appeared before this Court at a pre-motion conference and discussed many of the potential deficiencies in Plaintiffs' Complaint.  I granted Plaintiffs leave to amend the Complaint and set a schedule for the Motion to Dismiss briefing.  Plaintiffs filed their AC on December 5, 2011, (Doc. 9), alleging that Defendants' conduct violated the Due Process Clause of the Fourteenth Amendment; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"); Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"); and various state-law provisions, and created a hostile education environment for LB.  Defendants moved to dismiss the AC on February 24, 2012. (Doc. 10.)

6

## II.    Documents the Court May Consider

### A.    Legal Standard

As part of its analysis of the pleadings, a Court may consider – in addition to the

complaint itself – materials attached or integral to the complaint, documents incorporated into

the complaint by reference, or matters of which the court may take judicial notice. *See Robinson*

*v. Pierce*, No. 11-CV-5516, 2012 WL 833221, at *3 (S.D.N.Y. Mar. 13, 2012).  More

specifically, the Court may consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in
> it by reference, (2) documents "integral" to the complaint and relied upon in it,
> even if not attached or incorporated by reference, (3) documents or information
> contained in [a] defendant's motion papers if plaintiff has knowledge or
> possession of the material and relied on it in framing the complaint, (4) public
> disclosure documents required by law to be, and that have been, filed with the
> Securities and Exchange Commission, and (5) facts of which judicial notice may
> properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation

marks omitted).  Rule 201 of the Federal Rules of Evidence permits judicial notice of a fact that

"(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately

and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R.

Evid. 201(b); *see United States v. Bryant*, 402 F. App'x 543, 545 (2d Cir. 2010) (summary

order).  Further, it is well established that courts may take judicial notice of publicly available

documents on a motion to dismiss. *See Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels &*

*Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (courts can "look to public records . .

. in deciding a motion to dismiss"); *In re Yukos Oil Co. Sec. Litig.*, No. 04-CV-5243, 2006 WL

3026024, at *21 n.10 (S.D.N.Y. Oct. 25, 2006) ("Court may take judicial notice[] of [news]

articles on a motion to dismiss without transforming it into a motion for summary judgment.")

(citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)). "In the motion to dismiss context, . . . a court should generally take judicial notice 'to determine what statements [the documents] contain[ ] . . . not for the truth of the matters asserted.'" *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 698 (S.D.N.Y. 2011) (second, third, and fourth alterations in original) (quoting *Kramer*, 937 F.2d at 774). "Federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings offered in conjunction with a Rule 12(b)(6) motion . . . ." *Carione v. United States*, 368 F. Supp. 2d 186, 191 (E.D.N.Y. 2005) (internal quotation marks omitted).

In contrast, on a motion to dismiss pursuant to 12(b)(1) and/or when one party challenges standing, "the Court may look to affidavits and other evidence outside the pleadings to resolve disputed jurisdictional fact issues." *E. Paralyzed Veterans Ass'n v. Lazarus-Burman Assocs.*, 133 F. Supp. 2d 203, 208 (E.D.N.Y. 2001); *cf. Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("[I]t is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing."); *McDermott v. N.Y. Metro LLC*, 664 F. Supp. 2d 294, 298 (S.D.N.Y. 2009) ("'[O]nce the defendants' motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) puts the plaintiffs' Article III standing in issue, the district court has leeway as to the procedure it wishes to follow.'") (alterations omitted) (quoting *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87-88 (2d Cir. 2006)). A district court may not, however, "'rely on conclusory or hearsay statements contained in'" the documents outside the pleadings. *TZ Manor, LLC v. Daines*, 815 F. Supp. 2d 726, 734 (S.D.N.Y. 2011) (quoting *J.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004)).

B.      Documents Submitted by the Parties

Plaintiffs have submitted the following documents in conjunction with their opposition to Defendants' Motion:  several news articles and internet print-outs concerning school bullying and teen suicide in the District, (Mattice Decl. Ex. 1);[2] an Affirmation by Plaintiffs' attorney, Jamie Mattice, Esq., (*id.* Ex. 2); an email from HB to Superintendent Mehrhof complaining that LB's suspension for the fight with CM was unduly harsh, (*id.* Ex. 3); transcripts of testimony taken pursuant to Section 50-h of the New York General Municipal Law (the "50-h Transcripts"), (*id.* Exs. 4-6); a letter, dated October 26, 2010, published by the United States Department of Education's Office for Civil Rights concerning school bullying (the "Dear Colleague letter"), (*id.* Ex. 7); and medical records from the Orange Regional Medical Center, (*id.* Ex. 8).  Defendants have attached only a 50-h Transcript as part of their reply.  (Kleinberg Reply Decl. Ex. A.)[3]

I could, but (as discussed below) need not, consider all of these documents for the purposes of deciding Defendants' Motion pursuant to Rule 12(b)(1) – *i.e.*, the standing issue – and I will consider only the news articles and Dear Colleague letter for the purposes of deciding the 12(b)(6) Motion, as discussed below.

1.      Internet Postings, News Articles, and Dear Colleague Letter

I will take judicial notice of the internet and news articles for the fact of their publication, but not for the truth of the statements contained therein. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 175-76 (S.D.N.Y. 2006)

---

[2] "Mattice Decl." refers to the Declaration of Jamie Mattice, Esq. in Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.  (Doc. 16.)

[3] "Kleinberg Reply Decl." refers to the Reply Declaration of Adam I. Kleinberg in Support of Defendants' Motion. (Doc. 23.)

("Courts may . . . take judicial notice of . . . press articles, for the fact of their publication."); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003) ("The Court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment."). *But see Contractors Against Unfair Taxation Instituted on New Yorkers v. City of N.Y.*, No. 93-CV-4718, 1994 WL 455553, at *2 n.3 (S.D.N.Y. Aug. 19, 1994) (not appropriate to consider newspaper articles and affidavits when deciding Rule 12(b)(6) motion unless motion is treated as one for summary judgment).

Similarly, I will also take judicial notice of the Dear Colleague letter because it is a public document.[4] *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998); *Missere v. Gross*, 826 F. Supp. 2d 542, 553 (S.D.N.Y. 2011); *Schubert*, 775 F. Supp. 2d at 698. As my discussion below makes clear, however, the existence of these documents – presumably offered to show Defendants' notice of the problem of bullying generally and at the School specifically – is not relevant.

2.      Mattice Affirmation

The Mattice Affirmation – which is essentially a regurgitation of the factual allegations in the AC – will not be considered for the purposes of this Motion, as it is generally improper to consider factual averments or legal arguments contained in an attorney affidavit on a 12(b)(6) motion. *See Car-Freshner Corp. v. Getty Images, Inc.*, 822 F. Supp. 2d 167, 174-75 & n.12 (N.D.N.Y. 2011) (court "may not properly consider" "sworn factual assertions" in attorney affidavit on 12(b)(6) motion); *Anderson v. Cnty. of Nassau*, 297 F. Supp. 2d 540, 545 (E.D.N.Y.

---

[4] *See* Letter from Russlynn Ali, Assistant Secretary for Civil Rights, U.S. Department of Education, Office for Civil Rights (Oct. 26, 2010), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

2004) (declining to take judicial notice of facts in attorney affidavit on motion to dismiss despite fact that "Court does not doubt the reliability of the facts in th[e] affidavit"); *Degrosiellier v. Solomon & Solomon, P.C.*, No. 00-CV-1065, 2001 WL 1217181, at *2 (N.D.N.Y. Sept. 27, 2001) ("Because the Court declines to consider any factual averments contained in defense counsel's supporting affidavit . . ., it is not necessary to either strike portions of the affidavit and/or convert defendant's motion to one for summary judgment . . . ."); *cf. Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988) ("If the district court considered [plaintiff's] affidavit in disposing of the Rule 12(b)(6) motion, it erred in failing to convert the motion to one for summary judgment . . . ."); *Wachtel v. Nat'l R.R. Passenger Corp.*, No. 11-CV-613, 2012 WL 292352, at *2 (S.D.N.Y. Jan. 30, 2012) (declining to consider plaintiff's affidavit attached to opposition to motion to dismiss because "the Court cannot consider affidavits in ruling on a motion to dismiss").

Moreover, while Mattice avers that the Affirmation is based on her "personal knowledge, review of the files and conversations [she has] had with [Plaintiffs]," (Mattice Decl. Ex. 2 ¶ 2), it is clear that the vast majority of the statements contained in the Affirmation could not be based on personal knowledge; the Affirmation is therefore certainly not appropriate for consideration at the motion to dismiss stage. *See Ugarte v. Johnson*, 40 F. Supp. 2d 178, 179 n.1 (S.D.N.Y. 1999) (attorney affirmation submitted in response to motion to dismiss "improperly contains factual argument that is not based on personal knowledge") (collecting cases).

Finally, it appears to the Court that the purpose of the Affirmation is to summarize the allegations in a document other than Plaintiffs' Memorandum of Law, so that Plaintiffs could devote to argument the full twenty-five pages allowed under my rules, *see* Individual Practices of Judge Cathy Seibel Rule 2.B.i, for a brief on a motion. The device of incorporating an

affirmation into a brief by reference, as Plaintiffs have done here, in order to evade the twenty-five page limit, rather obviously defeats the purpose of the rule and is not to be utilized by Plaintiffs' counsel again.

### 3.   Mehrhof Email and Medical Records

The email to Mehrhof and the medical records will not be considered because they are not referenced in or integral to the AC. The only communications with Mehrhof mentioned in the AC took place on October 29 and November 4 and concerned different subject matter from that in the November 1 email submitted by Plaintiffs. (*See* AC ¶¶ 41-42.) Similarly, while the AC mentions that LB was treated for "scratches" at Monroe Pediatric after her fight with CM, (*id.* ¶ 35), it mentions nothing about the treatment described in the records from Orange Regional Medical Center. Accordingly, these documents will not be considered for purposes of the 12(b)(6) Motion.

### 4.   50-h Transcripts

Finally, I will not consider the 50-h Transcripts because they contain additional factual allegations not presented in the AC, and it would be improper to consider these assertions without converting the Motion to one for summary judgment. *See Willing v. Suffolk Cnty. Dep't of Soc. Servs.*, No. 09-CV-5285, 2010 WL 2736941, at *3 (E.D.N.Y. July 8, 2010) (noting that relevant material in transcript of 50-h hearing not properly considered on 12(b)(6) motion without converting motion to one for summary judgment); *Hazan v. City of N.Y.*, No. 98-CV-1716, 1999 WL 493352, at *7 (S.D.N.Y. July 12, 1999) (same, even where 50-h hearing was mentioned in complaint). *But cf. Dellate v. Great Neck Union Free Sch. Dist.*, No. 09-CV-2567, 2010 WL 3924863, at *4 (E.D.N.Y. Sept. 30, 2010) (considering 50-h transcript on motion to dismiss where hearing had not yet occurred at time action was commenced so transcript could

not have been attached to or incorporated into the complaint, because "the record was available to and clearly known of by all parties") (internal quotation marks omitted), *aff'd*, 448 F. App'x 164 (2d Cir. 2012) (summary order).[5]

Plaintiffs have already had the opportunity to amend the Complaint and evidently chose not to include in the AC certain facts discussed at the 50-h hearings or attach the transcripts to the AC. Moreover, it does not appear that Plaintiffs relied on the transcripts rather than their own recollection of the events in drafting the AC. Accordingly, I decline to consider the transcripts at the present stage or to convert the motion to one for summary judgment. *See Aguilera v. Cnty. of Nassau*, 425 F. Supp. 2d 320, 323 (E.D.N.Y. 2006) (declining to consider 50-h transcripts despite fact that substance of them was not in dispute because "plaintiff does not incorporate his 50-h testimony by reference in the complaint. Nor has the plaintiff attached the transcript to the complaint, . . . . [and] there is no reason to believe that the plaintiff relied on the transcript of his own testimony, rather than his independent recollection of the events, in drafting the pleading.").

## III.  Discussion

### A.  Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a

---

[5] The 50-h examinations at issue here were conducted in February and March 2011, (*see* Mattice Decl. Exs. 4-6), and the AC was filed in December 2011, (*see* Doc. 9).

13

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

B.    Federal Claims

1.    Substantive Due Process[6]

Plaintiffs allege that LB has a property interest in a public education and that Defendants deprived her of this right by "intentionally and deliberately" failing to protect LB from bullying

---

[6] Plaintiffs make a passing reference to procedural due process in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Ps' Mem."), (Doc. 15), at 10. They do not, however, explicitly assert a procedural due process claim in the AC, do not appear to argue such a claim in their Memorandum of Law, and represented to this Court, at the pre-motion conference on November 4, 2011, that they were not pursuing such a claim. Accordingly, I will assume there is no procedural due process claim before the Court.

14

and to train and supervise the District's employees, in violation of the Fourteenth Amendment of the Constitution.  (AC ¶¶ 60-65; Ps' Mem. 11.)

>    a.    Deprivation of a Property Interest

"To state a due process violation – procedural or substantive – Plaintiff[s] must first show a deprivation of a constitutionally protected property or liberty interest." *Perez v. Metro. Transp. Auth.*, No. 11-CV-8655, 2012 WL 1943943, at *8 (S.D.N.Y. May 29, 2012) (internal quotation marks omitted); *see JG & PG ex rel. JG III v. Card*, No. 08-CV-5668, 2009 WL 2986640, at *5 (S.D.N.Y. Sept. 17, 2009).  If this threshold requirement is satisfied, a court may then decide whether the deprivation of the protected interest is a violation of substantive due process. *See, e.g.*, *Toussie v. Cnty. of Suffolk*, 806 F. Supp. 2d 558, 579 (E.D.N.Y. 2011).

>    i.    Property Interest

Plaintiffs may establish a property interest protected by the Fourteenth Amendment by demonstrating a "'legitimate claim of entitlement' to the benefits in question." *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 449 (S.D.N.Y. 1998) (quoting *Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir. 1996)).  The Second Circuit has found that Article XI, Section 1 of the New York Constitution[7] "does not appear . . . alone [to] give[] rise to a legitimate claim of entitlement" to a public education, but that New York Education Law Section 3202(1)[8] does so.  *Handberry v. Thompson*, 446 F.3d 335, 353 (2d Cir. 2006); *see Saggio v. Sprady*, 475 F. Supp. 2d 203, 210 (E.D.N.Y. 2007) (New York Education Law Section 3202(1) establishes a right to public

---

[7] "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." N.Y. Const. art. XI, § 1.

[8] "A person over five and under twenty-one years of age who has not received a high school diploma is entitled to attend the public schools maintained in the district in which such person resides without the payment of tuition." N.Y. Educ. Law § 3202(1).

education).  Thus, LB has a property interest in a public education protected by the Fourteenth Amendment.

ii.   <u>Deprivation</u>

It appears from the pleadings, however, that Defendants did not deprive LB of the property interest "entitl[ing her] to attend the public schools maintained in the district in which [she] resides." N.Y. Educ. Law § 3202(1).  Plaintiffs do not assert that LB was deprived of a property interest by way of her suspension.  Rather, they allege that Defendants' failure to remedy the bullying and harassment towards LB created an "educational environment . . . so hostile and dangerous . . . that LB could not stay in [the School]."  (AC ¶¶ 63-65.)  Defendants, however, did not actually prevent LB from attending the School (or any other school within the District) in any way; rather, LB's parents, of their own volition, removed her from the School and placed her in a private school.  *See Saggio*, 475 F. Supp. 2d at 210 ("Most importantly, the District did not exclude [student] from attending school.  It thus cannot be said that the District infringed upon her right to an education.");  *cf. Goss v. Lopez*, 419 U.S. 565, 573-75 (1975) (expulsion or suspension for misconduct without fair procedures to determine whether misconduct occurred constitutes deprivation without due process); *Takeall v. Ambach*, 609 F. Supp. 81, 85-86 (S.D.N.Y. 1985) (refusal to admit plaintiff to schools in Defendant school district constituted deprivation of property interest).

While Plaintiffs maintain that LB was "forc[ed] to withdraw" from the School and "constructively expelled" due to Defendants' behavior, (Ps' Mem. 11), this contention, while perhaps legally viable in theory, *cf. Smith v. Guilford Bd. of Educ.*, 226 F. App'x 58, 63 (2d Cir. 2007) (summary order) (district court failed to construe reasonable inferences in plaintiffs' favor when it found that student voluntarily withdrew from school where plaintiffs alleged that student

16

was "effectively *forced* to withdraw") (emphasis in original), is not plausible on these facts.

Construing the AC in the light most favorable to Plaintiffs, LB suffered fewer than ten instances

of rude name-calling and was shoved once and punched once over the course of two to three

months. While I do not minimize how difficult that must have been for LB, if Defendants sat

back and did nothing to address the behavior – an assumption belied by the AC – it is not

plausible that these circumstances were so unbearable that LB was *forced* to withdraw from the

School. But drawing all reasonable inferences in Plaintiffs' favor, for the purposes of this

Motion I will assume that Defendants may be said to have denied LB a property right by

effectively forcing her to withdraw from the School.

        b.    <u>Defendants' Obligation to Remedy Bullying and Harassment</u>

"The central question raised by this case is what actions, if any, a school is required to

take to stop bullying" of its students. *T.K. v. N.Y.C. Dep't of Educ.*, 779 F. Supp. 2d 289, 307

(E.D.N.Y. 2011).

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). "Nevertheless,

there are limited circumstances where the state has created a danger or has a special relationship

with an individual, when it will be required to protect a person's right to personal inviolability

from private or public abuse." *T.K.*, 779 F. Supp. 2d at 307; *see Santucci v. Newark Valley Sch.

Dist.*, No. 05-CV-971, 2005 WL 2739104, at *2 (N.D.N.Y. Oct. 24, 2005) ("[C]ourts have

17

overwhelmingly held that, absent the existence of some special relationship or some conduct on the part of the municipality that creates a causal relationship between the municipality and the alleged injury, municipalities have no obligation to protect private parties from the acts of other private parties.") (collecting cases).

i.       Special Relationship

While the Second Circuit has not squarely decided the issue, courts in this Circuit and elsewhere have generally held that "[e]ven in light of compulsory [education] attendance laws, no special relationship is created between students and school districts such that school districts take on any such duty to protect students from the private actions of others," including "assaults by other students." *Santucci*, 2005 WL 2739104, at *3 (collecting cases); *see Chambers v. N. Rockland Cent. Sch. Dist.*, 815 F. Supp. 2d 753, 763 n.10 (S.D.N.Y. 2011) ("The consensus among the courts is that the 'special relationship' doctrine does not apply to the school setting.") (collecting cases); *Patenaude v. Salmon River Cent. Sch. Dist.*, No. 03-CV-1016, 2005 WL 6152380, at *11 (N.D.N.Y. Feb. 16, 2005) ("'[S]chools have no duty under the Due Process Clause to protect students from assaults by other students, even where the school knew or should have known of the danger presented.'") (quoting *Seamons v. Snow*, 84 F.3d 1226, 1235-36 (10th Cir. 1996)) (collecting cases).

I agree with the weight of authority on this matter and find unpersuasive the two cases cited by Plaintiffs in support of their position: *T.K.* and *Pagano v. Massapequa Pub. Sch.*, 714 F. Supp. 641 (E.D.N.Y. 1989). *T.K.* did not decide the question at issue here, *see T.K.*, 779 F. Supp. 2d at 308, and *Pagano* did not address the issue in depth, was decided over twenty years ago, and has since been distinguished by several other courts based in part on subsequent authority, *see, e.g., Crispim v. Athanson*, 275 F. Supp. 2d 240, 247 (D. Conn. 2003)

18

(distinguishing, based on the "restrictive language of *DeShaney* and its progeny," the two district court cases in this circuit, including *Pagano*, that "have found 'some duty' of care on behalf of school officials to protect students from physical and verbal abuse by other students"). Accordingly, as I noted two months ago in a similar case involving the same counsel on both sides, I agree with the majority of courts on this issue, *see S.C. v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-1672, 2012 WL 2940020, at *8 n.15 (S.D.N.Y. July 18, 2012), and find that there was no special relationship between Plaintiffs and the District that would impose on Defendants a duty to protect LB from harassment by other students.

ii.     State-Created Danger

Similarly, Plaintiffs have not plausibly pleaded that Defendants may be held liable for a due process violation under the state-created danger exception, which would require Defendants to have "assisted in creating or increasing the danger" to LB. *Matican v. City of N.Y.*, 524 F.3d 151, 155 (2d Cir. 2008) (internal quotation marks omitted). In defining the contours of this doctrine, "the Second Circuit has 'sought to tread a fine line between conduct that is "passive" . . . and that which is "affirmative"' . . ., an exercise that the court acknowledged can be 'difficult.' Nonetheless, the court had little trouble in holding that plaintiffs' allegations regarding officers who either failed to intercede, or otherwise 'stood by and did nothing' . . . were 'inadequate to state a substantive due process claim.'" *Chambers*, 815 F. Supp. 2d at 765 (internal citations omitted) (quoting *Pena v. DePrisco*, 432 F.3d 98, 109-10 (2d Cir. 2005)). In other words, "[a] failure to interfere when misconduct takes place, and no more, is not sufficient to amount to a state *created* danger." *Pena*, 432 F.3d at 110 (emphasis in original); *see Matican*, 524 F.3d at 157-58 (officers' failure to take certain steps to protect plaintiff was too passive to constitute state-created danger, even where officers had promised to protect plaintiff); *Jackson v. N.Y.C.*

19

*Dep't of Educ.*, No. 10-CV-9193, 2011 WL 2652577, at \*3 (S.D.N.Y. July 7, 2011) (school's failure to discipline student cannot be construed as state-created danger); *Scruggs v. Meriden Bd. of Educ.*, No. 03-CV-2224, 2007 WL 2318851, at \*12 (D. Conn. Aug. 10, 2007) (state-created danger theory does not impose duty on defendants to protect students from bullying and harassment even where school knew about danger) (collecting cases); *Matican v. City of N.Y.*, 424 F. Supp. 2d 497, 505 (E.D.N.Y. 2006) ("simply failing to intercede or punish misconduct" insufficient to trigger state-created danger exception), *aff'd*, 524 F.3d 151 (2d Cir. 2008).

In assessing whether a state-created danger exists, courts have looked to "a number of common elements": (1) "the actor must have acted affirmatively, using his or her authority to create an opportunity that would not otherwise have existed for the third party's acts to occur"; (2) "there must be evidence that the state actor had culpable knowledge of the danger in which he or she was placing the victim"; (3) "there must be evidence that the state actor's conduct caused the injury to the victim, or contributed to it in some material way"; and (4) "there must be evidence that the state actor's conduct was so egregious or outrageous that it is conscience-shocking." *Santucci*, 2005 WL 2739104, at \*5.

Plaintiffs fail to plead any of these elements. Given that the bulk of the AC alleges harm based on Defendants' failure to act or supervise, Plaintiffs can point to only two "affirmative acts," *Pena*, 432 F.3d at 110, by Defendants: they assert that Defendants "took affirmative action" by (1) placing PG in LB's lunch period and "allowing PG to remain in LB's lunch period for two weeks" after Plaintiffs demanded that he be removed, and (2) suspending LB after she defended herself from a physical attack. (Ps' Mem. 9.) The former is insufficient to establish a state-created danger because none of the alleged harm that LB suffered – threats, bullying, intimidation, and acts of violence at the hands of the Girls, (*see* AC ¶¶ 60, 63) – stemmed from

20

her being in the same lunch period as PG. Nor did the injury she suffered from her earlier encounters with PG have anything to do with her later placement in the same lunch period. In other words, Plaintiffs have not alleged that LB was injured in any fashion from her lunchtime proximity to PG or even vulnerable to abuse by PG at school, let alone that Defendants facilitated or approved of PG's misconduct in away way, *see Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 428-29 (2d Cir. 2009), particularly given that there is no indication that LB's and PG's placement in the same lunch period was intentional.

As to the latter, Defendants' suspension of LB for participating in a physical fight cannot be construed as a state-created danger. In suspending LB, Defendants did not create an opportunity for harassment that would not have existed, nor did they place LB in any danger. In fact, the argument that Defendants' adherence to a "zero-tolerance" policy against school violence somehow *created* a danger to LB seems somewhat ironic. The suspension may have been unfair, but Plaintiffs have failed to plausibly plead that Defendants' conduct constituted a state-created danger.

Yet even assuming that Plaintiffs had sufficiently pleaded facts that would bring this case under the special relationship or state-created danger exception, their claims would still fail, because Defendants' behavior cannot be said to "shock the contemporary conscience," as discussed below. *Matican*, 524 F.3d at 155 (even if plaintiff's claim falls within special relationship or state-created danger exception, and officers' behavior violated constitutional obligation, plaintiff still faces hurdle of showing that officers' behavior shocked conscience).

c.    Shocking the Conscience

Plaintiffs allege that Defendants' failure to remedy the bullying and harassment LB

experienced and to supervise and train their employees amounts to a conscience-shocking

"history of inaction and deliberate indifference."  (AC ¶¶ 63-64.)

"To state a substantive due process claim, a plaintiff must allege that . . . the state action

that deprived [her] of [a constitutionally protected] interest was oppressive or arbitrary." *JG*,

2009 WL 2986640, at *5.  Conduct that is deemed to be "arbitrary or oppressive" must "shock

the conscience."  *Id.*  "While the measure of what is conscience shocking is no calibrated yard

stick," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998), "conduct intended to injure in

some way unjustifiable by any government interest is the sort of official action most likely to rise

to the conscience-shocking level," *id.* at 849.  As the Second Circuit has stated,

> [s]ubstantive due process is an outer limit on the legitimacy of governmental
> action. It does not forbid governmental actions that might fairly be deemed
> arbitrary or capricious and for that reason correctable in a state court lawsuit
> seeking review of administrative action. Substantive due process standards are
> violated only by conduct that is so outrageously arbitrary as to constitute a gross
> abuse of governmental authority.

*Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).  Making a bad decision or acting

negligently is not the sort of "conscience-shocking" behavior that violates the Constitution,

*Lewis*, 523 U.S. at 848-49; *see Grune v. Rodriguez*, 176 F.3d 27, 33 (2d Cir. 1999) (to

demonstrate a due process violation, Plaintiffs must show Defendants "acted with more than

mere negligence") (citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986)); *Williams v. King*, 796

F. Supp. 737, 742 (E.D.N.Y. 1992) ("[A] 'mere lack of due care' by a state official is not

cognizable as a 'deprivation' under the Fourteenth Amendment.") (quoting *Daniels*, 474 U.S. at

330-31), nor necessarily is conduct that violates state law, *see Padberg v. McGrath-McKechnie*,

203 F. Supp. 2d 261, 283 (E.D.N.Y. 2002).  Rather, "[f]or Plaintiffs to demonstrate conscience-

22

shocking behavior . . ., they must establish at least a plausible claim that Defendants were

repeatedly and deliberately indifferent to an obvious threat of violence to [LB]." *Chambers*, 815

F. Supp. 2d at 770.

In *Smith*, 226 F. App'x 58,[9] a case much like this one, the Second Circuit found that

"failure to respond to the harassing and bullying to which [the student] was subjected . . ., while

highly unfortunate, d[id] not rise to the level of egregious conduct . . . so brutal and offensive to

human dignity as to shock the conscience." *Id.* at 62 (third alteration in original) (internal

quotation marks omitted).  The bullying at issue included, but was not limited to,

> (1) pushing and shoving; (2) blocking [the student's] entrance into or out of
> classrooms, restraining and imprisoning him therein; (3) placing [the student] on
> [other] students' shoulders and physically treating him "like a baby;" (4) teasing,
> harassing, bullying and tormenting [the student] on a daily basis; (5) forcing [the
> student] into a backpack, zipping the pack, then parading the backpack, with [the
> student] visible, through the halls of the school; (6) mocking [the student] with
> sexually suggestive comments; (7) on at least one occasion, picking him up
> against his will, cradling and treating him as if he were a baby; [and] (8) grabbing,
> assaulting, restraining, imprisoning, and teasing him with disparaging or
> threatening comments.

*Smith v. Guilford Bd. of Educ.*, No. 03-CV-1829, 2005 WL 3211449, at *1 (D. Conn. Nov. 30,

2005), *aff'd in part, vacated in part*, 226 F. App'x 58 (2d Cir. 2007) (summary order).

As in *Smith*, Defendants' response to the bullying of LB did not "transgress[] the outer

limit of legitimate governmental action," *Cohn v. New Paltz Cent. Sch. Dist.*, 363 F. Supp. 2d

421, 434 (N.D.N.Y. 2005) (internal quotation marks omitted), so as to shock the conscience.

Notably, Plaintiffs' version of the facts is generally silent with regard to whether Defendants

responded to Plaintiffs' complaints about verbal harassment or followed through when they

stated they would take action to address the complaints. (*See, e.g.*, AC ¶¶ 24, 26, 29, 32.) The

---

[9] While the Second Circuit's rulings by summary order do not have precedential effect, *see* 2d Cir. R. 32.1.1(a), I
find *Smith* persuasive and directly on point in this case.

failure to allege that Defendants did not respond or follow through in various instances suggests they did, even if their efforts were ineffective.  But even if they did nothing in response to the complaints, that failure to respond to verbal harassment and limited physical abuse[10] is, as in *Smith* – where the bullying was arguably more severe than the conduct alleged here – not conscience-shocking, and Plaintiffs have cited no case law that would suggest a different result. *See Smith*, 226 F. App'x at 61, 63 (no substantive due process violation even where defendants allegedly knew of some or all of the mistreatment plaintiff endured, "yet condoned, permitted and/or acquiesced in such mistreatment") (internal quotation marks omitted); *see also Chambers*, 815 F. Supp. 2d at 771 (assistant principal's underestimate of severity of harassment of plaintiff-student and accompanying imposition of minimal punishment on harassers who later violently attacked plaintiff-student did not shock conscience); *id.* (no deliberate indifference where, before culminating incident of violence, there had been no violence between student and her harassers, "and Plaintiffs have failed to cite any legal authority that required [school] to suspend or otherwise punish [harassers] for their verbal volleys at [student], even if some involved threatening comments") (collecting cases); *Scruggs*, 2007 WL 2318851, at *13 ("In retrospect, . . . the record reflects poorly on Defendants' decisions to relatively limit their response to the repeated bullying of [student] by his classmates; nevertheless, Defendants' failure to fully remedy the bullying situation does not amount to 'brutal' or 'oppressive' treatment of [student] at school."); *cf. Yap ex rel. Yap v. Oceanside Union Free Sch. Dist.*, 303 F. Supp. 2d 284, 295-96 (E.D.N.Y. 2004) ("Plaintiffs have proffered no case law wherein the alleged failure of a school

---

[10] Before the punch of LB by CM on October 28, there had been no physical violence between LB and the Girls other than a shove on September 3.  (AC ¶ 21.)

to adequately discipline its students met [the] substantive due process threshold. The Court's

independent research has similarly failed to reveal any such case law.").

In sum, that Defendants' response to Plaintiffs' complaints failed to stop the bullying of

LB may give rise to a state-law negligence claim – I express no view on the subject – but not to a

substantive due process violation. *Cf. Musco Propane, LLP v. Town of Wolcott*, No. 10-CV-

1400, 2011 WL 3267756, at *5 (D. Conn. July 28, 2011) ("In determining whether a plaintiff has

stated a claim for violation of federal substantive due process, the court is mindful that the

Fourteenth Amendment is not a 'font of tort law.'") (quoting *Pena*, 432 F.3d at 112). Because

Defendants' actions do not shock the conscience, Plaintiffs' substantive due process claim fails

for this additional reason.[11] Accordingly, Defendants' Motion is granted as to Plaintiffs'

substantive due process claim.[12]

> ## 2. Title VI

Title VI provides that "[n]o person in the United States shall, on the ground of race,

color, or national origin, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial

assistance.'" 42 U.S.C. § 2000d; *see Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001). In

order to establish a Title VI violation, a plaintiff must show, through specific factual allegations,

---

[11] This is not the first case brought by Plaintiffs' counsel, alleging a similar claim, that I have dismissed. While I am sympathetic to victims of school bullying and believe that the problem is real, *see, e.g., T.K.*, 779 F. Supp. 2d at 297-306 (describing bullying in America and its effects on various parties involved), it appears that federal court is rarely the proper forum for addressing this issue. Not every wrong is of constitutional dimension. Given the lack of controlling appellate authority disapproving such claims, I do not suggest that Plaintiffs' counsel have violated their professional obligations in bringing such cases. But given the abundance of district court authority that bullying cases against school districts do not present valid federal constitutional claims, Plaintiffs' counsel should at least be apprising their clients of the unfavorable precedents before filing such cases.

[12] Because Plaintiffs have failed to plead that they suffered a constitutional violation, I need not address whether they have adequately pleaded *Monell* liability. *See Matican*, 524 F.3d at 154. Similarly, because no constitutional violation has been established, any claim based on a theory of failure to train or supervise is also dismissed. *See Bukovinsky v. Sullivan Cnty. Div. of Health & Family Servs.*, 408 F. App'x 406, 408 (2d Cir. 2010) (summary order).

*see Faccio v. Eggleston*, Nos. 10-CV-783, 10-CV-699, 2011 WL 3666588, at *9 (N.D.N.Y. Aug.

22, 2011) (discriminatory animus must be pleaded with particularity); *TC v. Valley Cent. Sch.*

*Dist.*, 777 F. Supp. 2d 577, 595 (S.D.N.Y. 2011) (same); *Lopez v. Bay Shore Union Free Sch.*

*Dist.*, 668 F. Supp. 2d 406, 414 (E.D.N.Y. 2009) (same), that "(1) the defendant discriminated on

a prohibited basis; (2) the discrimination was intentional; and (3) the discrimination was a

substantial or motivating factor for the defendant's action," *Faccio*, 2011 WL 3666588, at *9;

*see Tolbert*, 242 F.3d at 69. "Typically, facts that support an inference of racial animus relate to

long-term practices of discrimination, or to comments made by individuals suggesting that they

harbor racial biases." *Lopez*, 668 F. Supp. 2d at 414.

  "In addition, teachers, administrators, and boards of education can be liable for student-

on[-]student racial harassment if their deliberate indifference to racial harassment can be

interpreted as discriminatory." *Faccio*, 2011 WL 3666588, at *9; *cf. Gant v. Wallingford Bd. of*

*Educ.*, 195 F.3d 134, 140 (2d Cir. 1999).  In order to plead a deliberate indifference claim under

Title VI, "the plaintiff must allege facts demonstrating that the school (1) had actual knowledge

of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and

objectively offensive that it (4) deprived the victim of access to the educational benefits or

opportunities provided by the school." *Rodriguez v. N.Y. Univ.*, No. 05-CV-7374, 2007 WL

117775, at *6 (S.D.N.Y. Jan. 16, 2007) (internal quotation marks omitted); *see TC*, 777 F. Supp.

2d at 594; *DT v. Somers Cent. Sch. Dist.*, 588 F. Supp. 2d 485, 493 (S.D.N.Y. 2008), *aff'd*, 348

F. App'x 697 (2d Cir. 2009) (summary order).  "The deliberate indifference 'must, at a

minimum, cause [the student] to undergo harassment or make [the student] liable or vulnerable

to it.'" *TC*, 777 F. Supp. 2d at 596 (first alteration in original) (quoting *Davis ex rel. LaShonda*

*D.*, 526 U.S. 629, 645 (1999)); *see DT*, 348 F. App'x at 700.  The standard is not a negligence

one, however, as "deliberate indifference is more than a mere reasonableness standard that transforms every school disciplinary decision into a jury question." *TC*, 777 F. Supp. 2d at 596 (alteration and internal quotation marks omitted). Moreover, "courts should avoid second guessing school administrators' decision[s] and should defer to the judgment of those administrations that are important to the 'preservation of order in the schools.'" *Id.* (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 342 n.9 (1985)).

Plaintiffs have alleged that the District is a recipient of federal funds. Plaintiffs have not, however, plausibly pleaded race discrimination by Defendants in violation of Title VI. Plaintiffs' "disparate treatment" theory fails, (*see* Ps' Mem. 14-15), because there are no facts in the AC, Plaintiffs' Memorandum, or elsewhere, that could possibly support an inference of discrimination by Defendants. Indeed, Defendants are not alleged to have made any racially-tinged comments, referenced Plaintiffs' race, or treated Plaintiffs differently from people outside their protected class.

Similarly, Plaintiffs' claim fails under a theory of deliberate indifference to student-on-student racial harassment. Plaintiffs, in their Memorandum of Law and accompanying exhibits, assert that LB was called derogatory racial names on numerous occasions, (*see, e.g.*, Ps' Mem. 17), but the AC itself contains only one reference to race-related name-calling: Plaintiffs' report to Serrano on October 12, 2010 that five of the Girls had followed LB into the bathroom and called her "'dirty spic'" and "'gorilla.'" (AC ¶ 27.) *See Robinson*, 2012 WL 833221, at *3 (court considers only pleadings when evaluating 12(b)(6) motion). This sole instance of race-related conduct cannot support a deliberate indifference claim for two reasons. First, assuming that Defendants had actual knowledge of this comment and turned a blind eye to it, the utterance of one comment by a student cannot be said to be so "severe, pervasive and objectively

27

offensive" that it effectively denied LB educational benefits. *Rodriguez*, 2007 WL 117775, at

*6; *see Gant*, 195 F.3d at 142 (failure to take "direct responsive action" to single incident of

race-based name-calling does not amount to deliberate indifference); *Atkins v. Bremerton Sch.*

*Dist.*, No. 04-CV-5779, 2005 WL 1356261, at *2-3 (W.D. Wash. June 7, 2005) (holding that

failure to discipline teacher for racially-offensive comment toward student was not Title VI

violation, and noting that "Plaintiff has not cited, and the court has been unable to find, an

analogous case where a 'stray remark' . . . amounts to an actionable Title VI violation"); *Folkes*

*v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. of Tech.*, 214 F. Supp. 2d 273, 292 (E.D.N.Y.

2002) (single racially-offensive comment "does not rise to the level of severity necessary to

make out a [Title VI] claim"); *cf. DT*, 588 F. Supp. 2d at 496 ("As a matter of law, we cannot

agree with plaintiffs' contention that the fact that [non-party teacher] witnessed the incident . . .

and chose to do nothing satisfies the requirement that the defendants must have acted with

deliberate indifference.") (alterations and internal quotation marks omitted).[13]

Second, Plaintiffs have presented no facts plausibly indicating that Defendants' conduct

"'effectively caused'" subsequent harassment "as is required for a claim under Title VI." *DT*,

348 F. App'x at 700 (quoting *Davis*, 526 U.S. at 642-43). Plaintiffs have not pleaded any facts

involving subsequent race-based harassment,[14] *see DT*, 588 F. Supp. 2d at 496-97 (no deliberate

---

[13] Moreover, even if the slurs were repeatedly used, such conduct – while reprehensible – would not amount to harassment so severe and pervasive as to deprive LB of educational opportunities. (*See* pages 32-33 below.)

[14] Any argument claiming that after LB reported the "dirty spic" comment to Serrano, Defendants became "aware of potential racial discrimination, [such that] all the other incidents to which [LB] was subjected (*e.g.*, physical assaults, non-race-based name-calling . . ., etc.) were in furtherance of the race-based harassment," *DiStiso v. Cook*, No. 10-CV-4304, 2012 WL 3570755, at *16 (2d Cir. Aug. 21, 2012) (internal quotation marks omitted), would fail because that argument has been explicitly rejected by the Second Circuit. *See id.* at *17 ("To date, no Supreme Court or Second Circuit law clearly establishes that evidence of prior racial name-calling by . . . students suffices to demonstrate that *any* subsequent physical misbehavior directed at the same classmate is also racially motivated. Indeed, we conclude that something more is necessary to support an inference that a teacher or school official actually knew such subsequent misconduct was racially motivated.") (emphasis in original). Plaintiffs have pleaded

indifference where, after complained-of incident, plaintiff's son "had no 'racial incidents'" with harassers who used racial slur towards him); *cf. id.* ("[C]ourts have been skeptical of arguments premised on the degree to which a school punishes its students."), nor have they set forth facts plausibly suggesting that Defendants harbored any racial animus, *see id.* at 493 ("Title VI provides for liability only where the educational institution is deliberately indifferent . . . to such an extent that the indifference can be seen as racially motivated.") (alteration in original) (internal quotation marks omitted). Accordingly, Plaintiffs' Title VI claim is dismissed.

3.     Title IX

Plaintiffs also seek to hold Defendants liable for deliberate indifference to sexual harassment. (*See* Ps' Mem. 17-19.) Under Title IX,[15] "recipients of federal funding may be liable for subjecting their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." *Davis*, 526 U.S. at 646-47 (alteration and internal quotation marks omitted). In other words, Defendants may be liable if they were "deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650. Moreover, as stated previously, "the deliberate indifference must, at a minimum, cause [students] to undergo harassment or make

---

no facts that would indicate that Defendants had any basis to believe that the subsequent misconduct LB experienced had anything to do with her race.

[15] Courts generally analyze Title IX and Title VI claims under the same standards. *See Shelton v. Trs. of Columbia Univ.*, No. 04-CV-6714, 2005 WL 2898237, at *7 (S.D.N.Y. Nov. 1, 2005) ("Title VI claims are analyzed under the same standards applied to Title IX claims."), *rev'd on other grounds*, 236 F. App'x 648 (2d Cir. 2007) (summary order); *cf. Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (Title IX was "modeled after Title VI . . . . which is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs."); *id.* ("The two statutes operate in the same manner . . . ."); *DT*, 588 F. Supp. 2d at 493 n.12 (same).

them liable or vulnerable to it," *id.* at 645 (alteration in original) (internal quotation marks omitted), and "the harassment must take place in a context subject to the school district's control," *id.*, for example, "during school hours and on school grounds," *id.* at 646. Finally, the harassment must be "*because of* gender," not simply involve gender-based terms. *Patenaude*, 2005 WL 6152380, at *5 (emphasis added) (alteration and internal quotation marks omitted); *cf. Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("We have never held that workplace harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations.").[16]

Moreover, the Supreme Court has admonished courts to take pains when applying Title IX in the school setting to ensure that the purported harassment is sufficiently severe, noting that "students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it," but "[d]amages are not available for simple acts of teasing and name-calling among school children, . . . even where these comments target differences in gender." *Davis*, 526 U.S. at 651-52; *see id.* at 652 ("It is not enough to show . . . that a student has been teased or called offensive names.") (alteration, citation, and internal quotation marks omitted).

Plaintiffs base their Title IX claim on two theories of liability. First, they claim that the District, a recipient of federal funding, was deliberately indifferent "to the well-being of LB" because Defendants put LB and PG in the same lunch period together and thereby made LB "'vulnerable' to further harassment." (Ps' Mem. 18-19.) This theory fails, as there are no allegations that PG's molestation ever occurred during school hours or on school grounds or that

---

[16] While *Oncale* involved a Title VII claim, its "reasoning . . . is fully transferable to Title IX cases." *Brodsky ex rel. S.B. v. Trumbull Bd. of Educ.*, No. 06-CV-1947, 2009 WL 230708, at *7 (D. Conn. Jan. 30, 2009) (internal quotation marks omitted).

there was any risk of PG harming LB at school. Accordingly, it simply cannot be said that

Defendants' placement of LB and PG in the same lunch period made LB "undergo harassment"

or "liable or vulnerable to it," *Davis*, 526 U.S. at 645 (internal quotation marks omitted), let

alone that anything happened as a result of the two students being in the same lunch period that

would amount to "severe, pervasive, and objectively offensive" sexual harassment, *id.* at 650.[17]

     Second, Plaintiffs assert that gender-based name-calling by the Girls constituted sexual

harassment to which Defendants were deliberately indifferent. (Ps' Mem. 19.) Considering the

totality of the circumstances, Plaintiffs have not plausibly pleaded that LB was harassed by the

Girls *because of* her gender. *See Patenaude*, 2005 WL 6152380, at *5. It is true that some of the

Girls' insults had gender connotations (*e.g.*, "whore" and "bitch," (AC ¶ 76)), but LB was also

called names not associated with her gender (*e.g.*, "'fucking' rat," "'dirty spic,'" and "'gorilla,'"

(AC ¶¶ 22, 27)), and was physically assaulted in a non-gender-specific way, thus suggesting that

the Girls were picking on her for other reasons. *See Patenaude*, 2005 WL 6152380, at *6 (fact

that plaintiff was subjected to both gender-based and non-gender-based epithets, was physically

assaulted, and was not groped in ways typically associated with sexual harassment, suggested

tormenting was not gender-based). Even if the insults by the Girls were all gender-based (which

they were not), that alone is often insufficient to establish gender-based animus, particularly

among students. *See Davis* 526 U.S. at 652 (simple teasing and name-calling by students in a

---

[17] Plaintiffs object to the two-week lag between their notifying the school that PG had molested LB and Defendants moving PG to another lunch period. Aside from the fact that nothing happened between the two during those two weeks, Plaintiffs' premise – that Defendants were under some obligation to move PG once Plaintiffs accused him of harming LB out of school – is unsupported. Indeed, school administrators can hardly be expected to take immediate action against a student based simply on the word of another student or his or her parents. Once Defendants received documentary evidence (an order of protection) suggesting that PG had indeed harmed LB, they immediately separated the two. But it would be wholly unworkable to expect school administrators to separate students whenever a request for separation was made. And, in any event, as discussed above, the failure to separate upon request would not, without more, amount to deliberate indifference to severe or pervasive gender-based harassment.

way that targets gender is not actionable under Title IX); *Brodsky*, 2009 WL 230708, at *7

("[T]he use of gendered or sexually loaded insults such as 'bitch,' 'whore,' 'prude,' and 'slut'

can certainly be indicative of animus on the basis of sex, but the mere fact of their use is not

necessarily sufficient to establish such, particularly among children."). Drawing on my "judicial

experience and common sense," *Iqbal*, 556 U.S. at 679, the use of terms that may have had their

origin in gender animus but which have become all-purpose insults, especially between teenage

girls, is not enough to plausibly suggest gender animus. Plaintiffs have not plausibly alleged that

the Girls harassed LB because of her gender, and a thorough review of the AC reveals no reason

to believe that gender was the motivation for their cruelty.

Yet Plaintiffs' claim fails for an additional reason. Plaintiffs have not plausibly pleaded

that the Girls' bullying deprived LB of educational opportunities. At most they assert that LB's

grades and performance on her soccer team declined, (AC ¶¶ 43-44), which is insufficient for

Title IX purposes. *See Davis* 526 U.S. at 652 ("[A] mere decline in grades" is not enough to

"survive a motion to dismiss.") (internal quotation marks omitted). While they would like this

Court to believe that Defendants left them with no choice but to remove LB from the School and

enroll her in a private high school, it is simply not plausible that repeated instances of name-

calling and threats and one shove and one fight over the course of two-plus months constituted

behavior so "severe, pervasive, and objectively offensive" that LB was effectively denied access

to the School's resources and opportunities (even assuming that all of the misconduct was

gender-based). *Davis*, 526 U.S. at 651. If liability were appropriate in these circumstances,

every time a student was subject to repeated name-calling by his or her callous peers, with an

occasional eruption into physical contact causing no serious injury, parents would be entitled to

32

pull their child out of public school and place him or her in private school at the school district's expense. Accordingly, Defendants' Motion is granted as to Plaintiffs' Title IX claim.

### 4. Hostile Education Environment

In their fourth cause of action Plaintiffs allege that Defendants violated "Plaintiffs' federal civil rights" and "the Executive Law of the State of New York,"[18] (AC ¶ 87), by "failing to address the ongoing bullying, sexual and racial harassment, intimidation, and threats and acts of violence toward Plaintiffs[ and thus] creat[ing] a hostile educational environment," (*id.* ¶ 84). It is not clear what, if any, federal claim Plaintiffs are alleging in their fourth cause of action. Despite the opportunity to amend the Complaint and respond to Defendants' Memorandum of Law in which Defendants question what provision of federal law Plaintiffs believe has been violated, (*see* Ds' Mem. 20),[19] Plaintiffs have not specified the legal basis for this claim.[20] (*See* Ps' Mem. 20.) This Court will not speculate about what Plaintiffs intended. The claim is clearly insufficiently pleaded, and accordingly, Defendants' Motion is granted as to this claim.

### 5. Claims Asserted on HB's and SB's Own Behalf

Defendants assert that Plaintiffs HB and SB lack standing to assert claims on their own behalf because, as parents, they have not been subject to student harassment, and thus did not suffer any injury in fact. (Ds' Mem. 9-10.) Plaintiffs respond by asserting that they have suffered three distinct injuries: (1) direct discrimination, harassment, and assault; (2) emotional distress; and (3) financial harm. (Ps' Mem. 6; AC ¶¶ 7, 47.)

---

[18] To the extent Plaintiffs assert this claim pursuant to the New York Executive Law, I need not address it because I decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims, as discussed below.

[19] "Ds' Mem." refers to Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint. (Doc. 12.)

[20] In their Memorandum of Law, the only federal law that Plaintiffs mention in connection with their "hostile work environment claim" is Title VI. (*See* Ps' Mem. 20.) To the extent this claim is simply a reiteration of their Title VI claim, it fails for the reasons discussed above.

To the extent that HB and SB have asserted federal claims on their own behalf, they lack standing to pursue such claims. First, they lack standing to assert Title VI claims on their own behalf because they are not beneficiaries of federally-funded school programs. *See Rodriguez v. Boursiquot*, No. 09-CV-802, 2010 WL 985187, at *4 (S.D.N.Y. Mar. 17, 2010) (finding that plaintiff lacked standing to bring Title VI claim because claim was not brought on behalf of child or operator of after-school program and noting that "[t]he intended beneficiaries of a federally funded public school program are school children, not their parents") (alteration in original) (internal quotation marks omitted); *Schuler v. Bd. of Educ. of Cent. Islip Union Free Sch. Dist.*, No. 96-CV-4702, 2000 WL 134346, at *10 (E.D.N.Y. Feb. 1, 2000) ("In order to establish standing to sue under [Title VI] plaintiffs must be the intended beneficiaries of the federal spending program" and "[t]he intended beneficiaries of a federally funded public school program are school children, not their parents. Thus, while parents . . . may bring a Title VI action on behalf of a child who is the intended beneficiary of a funding program, parents may not bring the action on their own behalf.") (first alteration in original) (internal citation and quotation marks omitted).

For similar reasons, HB and SB also lack standing to assert Title IX claims on their own behalf. *See Phillips v. Anderson Cnty. Bd. of Educ.*, 259 F. App'x 842, 843 n.1 (6th Cir. 2008) (*per curiam*) (noting that plaintiff conceded district court correctly dismissed her father for lack of standing based on fact that he was neither potential beneficiary of federally funded program nor employee of such program so could not assert his own claims under Title IX); *Rowinsky v. Bryan Indep. Sch. Dist.*, 80 F.3d 1006, 1009 n.4 (5th Cir. 1996) ("It is undisputed that [plaintiff-parent] has standing, as next of friend, to assert the claims of her daughters, but nothing in the statutory language provides her with a personal claim under [T]itle IX."); *Davis v. Folsom*

34

*Cordova Unified Sch. Dist.*, No. 11-CV-1242, 2012 WL 592055, at *6 (E.D. Cal. Feb. 22, 2012) (parents lack standing to bring Title IX claim) (collecting cases); *Jones v. Beverly Hills Unified Sch. Dist.*, No. 08-CV-7201, 2010 WL 1222016, at *2 (C.D. Cal. Mar. 24, 2010) (mother does not have standing to bring private cause of action under Title IX), *report and recommendation adopted*, 2010 WL 1222023 (C.D. Cal. Mar. 25, 2010); *Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 954 (S.D. Ind. 2007) ("[I]t is apparent from the language of Title IX that a parent lacks standing to bring a cause of action in [his or her] individual capacity based on Title IX. Title IX only protects against actions that interfere with educational opportunities or activities. Because there are no educational opportunities or activities that the parents are excluded from, they have no claim."); *Soriano v. Bd. of Educ. of City of N.Y.*, No. 01-CV-4961, 2004 WL 2397610, at *1 n.2 (E.D.N.Y. Oct. 27, 2004) (noting plaintiff conceded parent did not have standing to bring Title IX claim); *Morgan v. City of N.Y.*, 166 F. Supp. 2d 817, 819 (S.D.N.Y. 2001) (same); *Haines v. Metro. Gov't of Davidson Cnty., Tenn.*, 32 F. Supp. 2d 991, 1000 (M.D. Tenn. 1998) ("Defendants correctly state that, typically, a parent may not bring a claim under Title IX" except on behalf or as next of friend of child) (collecting cases); *Doe v. Oyster River Coop. Sch. Dist.*, 992 F. Supp. 467, 481 (D.N.H. 1997) ("Ordinarily, only participants of federally funded programs – and not the participants' parents – have standing to bring claims under Title IX."); *Burrow v. Postville Cmty. Sch. Dist.*, 929 F. Supp. 1193, 1199 (N.D. Iowa 1996) (plaintiff-parents lack standing as individuals to assert claim under Title IX).[21]

Finally, although parents may sue on behalf of their minor child, they do not have standing to assert claims on their own behalf for a violation of their child's rights. *See T.P. v.*

---

[21] Even if HB and SB had standing to assert personal claims under Title VI and Title IX, such claims would fail on the merits because they have not alleged any facts demonstrating that they were excluded from participation, denied the benefits of, or subjected to discrimination under any school program.

*Elmsford Union Free Sch. Dist.*, No. 11-CV-5133, 2012 WL 860367, at *3 (S.D.N.Y. Feb. 27, 2012) (stating that "Section 1983 does not recognize a claim on behalf of one person arising from a violation of another person's rights" and holding that plaintiff-parent "cannot recover on any derivative claim based on a Section 1983 civil rights or Title IX violation simply because she is [child's] mother"); *JG*, 2009 WL 2986640, at *6 ("Plaintiff-Parents do not have standing to sue on their own behalf for violation of Plaintiff-Children's constitutional rights."); *Morgan*, 166 F. Supp. 2d at 819 (parent lacks standing to bring individual claims under Section 1983 for deprivation of daughter's constitutional rights).

While HB and SB argue that their own constitutional rights have been violated, their assertions are belied by the face of the AC. Their substantive due process claim, as pleaded, is entirely derivative of LB's claim – *i.e.*, it is based solely on harm inflicted on LB. (*See* AC ¶¶ 59-65.)[22] Further, nowhere in the AC do Plaintiffs argue that HB and SB suffered arbitrary or oppressive treatment by Defendants apart from Defendants' treatment of LB. Accordingly, they lack standing to assert a substantive due process violation on their own behalf. Thus, any claims brought on HB's and SB's own behalf are dismissed for lack standing.[23]

C.      State-Law Claims

The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having determined that

---

[22] Moreover, even if HB and SB had pleaded harm to themselves – for example, having to pay for LB's parochial school – their substantive due process claim would fail for the same reasons that LB's claim fails.

[23] As stated above, I need not – indeed, cannot – address whether HB and SB have standing to pursue a hostile work environment claim because it is not clear what federal law forms the basis for that claim. I also need not address whether HB and SB have standing to assert state-law claims on their own behalf because I decline to exercise jurisdiction over Plaintiffs' state-law claims, as discussed below.

all of the claims over which this Court has original jurisdiction should be dismissed, I decline to exercise supplemental jurisdiction over Plaintiffs' remaining state-law causes of action.

D.      Leave to Amend

Leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2); *see Zucker v. Five Towns Coll.*, No. 09-CV-4884, 2010 WL 3310698, at *3 (E.D.N.Y. Aug. 18, 2010). It is within the discretion of the district court to grant or deny leave to amend, *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007), and "[l]eave to amend, though liberally granted, may properly be denied for: undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks omitted).

During a conference before this Court on November 4, 2011, the Court and the parties discussed the deficiencies in Plaintiffs' Complaint, many of which were noted in Defendants' pre-motion conference letter. (Doc. 5.) The Court granted Plaintiffs leave to amend their Complaint in order to address numerous deficiencies. In response to the instant Motion, Plaintiffs have not asked to amend again. Thus, I decline to now *sua sponte* grant leave to amend again. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request [to amend the complaint] that was not made."); *Ariel (UK) Ltd. v. Reuters Grp., PLC*, 277 F. App'x 43, 45-46 (2d Cir. 2008) (summary order) (district court did not exceed its discretion in not *sua sponte* granting leave to amend where plaintiff had already amended complaint once and amendment would have been futile); *Payne v. Malemathew*, No. 09-CV-1634, 2011 WL 3043920, at *5 (S.D.N.Y. July 22, 2011) ("That

37

Plaintiff was provided notice of his pleading deficiencies and the opportunity to cure them is sufficient ground to deny leave to amend *sua sponte*.").

## IV.   Conclusion

For the foregoing reasons, Defendants' Motion is GRANTED.  Plaintiffs' federal claims are dismissed with prejudice, and their state-law claims are dismissed without prejudice.  The Clerk of Court is respectfully directed to terminate the pending Motion, (Doc. 10), and close the case.

**SO ORDERED.**

Dated: September 27, 2012
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

38